This time we'll hear United States v. Rutigliano. Good morning, Your Honors. My name is Joseph Ryan. I represent Mr. Rutigliano. I'm going to focus my portion of the time on why we're asking for a remand where the District Court will examine evidence as opposed to spreadsheets submitted by the government to determine an actual loss that not even the Railroad Retirement Board has claimed. Exhibit 19, which is in the appendix on the first direct appeal and 14152, is a spreadsheet of 267 claims and the cumulative amount adds up to $182,000. That's why he was originally sentenced. In the post-trial proceedings, the judge, based upon the RRB's findings, said that 114 of these lists on Exhibit 19, 112, are not actual losses because the agency determined by untainted sources and independent review that these particular pensioners were disabled and they were entitled to their money retroactively with no penalties. So that leaves on Exhibit 19 155 annuitants, which forms the basis for the current judgment of $41 million. What is the basis for the $41 million? It is a match conducted by the prosecution team by a computer that Mr. Rutigliano's application had phrases that were in the other 154 or so applications. It wasn't any evidence presented by an RRB examiner, for example, called to prove that Mr. Rutigliano was not entitled to his pension because he was able and he was not disabled. But there was evidence that how the original $82 million was dispersed was based on fraudulent submissions. So to that extent, there's evidence supporting the $42 million because it's a discounted version of the $82 million. The $82 million is based upon Exhibit 19, not upon fraudulent applications. Support for it is the totality of the evidence that these were all paid out based on fraudulent submissions to the railroad. With all due respect, Judge Radji, it wasn't based upon fraudulent, it was based upon a compilation of data that the prosecution was allowed to offer into evidence about this matching phrases. Judge Rorero said, I see it as a straightforward compilation of nothing more. That's the source of 19, not on fraudulent applications. In fact, we submitted evidence to show that these underlying, if you look at the RRB claim files, there was no reason to deny the pensions because each one of them had a physical impairment under which they were entitled to the pension, independent of any false statements. We offered before the sentencing hearing 23 cases that the government said were on this list and we showed that the RRB independently, in a routine, independent, untainted medical examination of the pensioner, re-approved the pension after it was originally proven. That's before any of this post-trial process. We gave the district court in two submissions in the post-trial proceedings, a document 854 was in the docket and 912 was in the docket, where we actually gave the files, the underlying RRB files, to the district court and said that these files show that these particular pensioners did have an impairment, such as a degenerative disc disease, which is common to most of these cases. And the RRB later on, when they did these post-trial survey, they also found those particular impairments still existed eight or ten years later. And that's understandable because the permanent nature of a disc disease or a torn meniscus is permanent. It just by itself doesn't- You've reserved a couple minutes of rebuttal. I did. So I'm way ahead of the game. I'll wait. Thank you very much. Happy to hear you then. Thank you, Judge. Good morning. My name is Sean Maher, excuse me, and I represent Appellant Crossappelli, Dr. Peter Ajamian. Unlike the other appellants, Dr. Ajamian is here not because he went to trial and was convicted by a jury, but because he entered a plea and entered a plea agreement in which one of the provisions of the plea agreement was an agreement to a restitution amount up to $116.5 million. What we have raised is that provision was born out of ineffective assistance of counsel. There are many indications of that ineffectiveness. First, in the pro se petition that Dr. Ajamian submitted to the district court, Dr. Ajamian recounted how his prior counsel browbeated Dr. Ajamian into thinking that if Dr. Ajamian did not accept this plea agreement, that perhaps dozens or more of his former patients would come in and actually potentially lie about their disability against Dr. Ajamian. At sentencing, I think this is on page 28 of my initial brief, prior counsel conceded on the record at sentencing that in the figures of losses proffered by the government and given to defense counsel, there were at least 78 names of patients of Dr. Ajamian who never applied for disability, yet were included in the loss calculations. But counsel stated he wasn't going to bother challenging that because there were hundreds of thousands of pages of in the process is that counsel should have carved out, putting aside all the other errors we raised and the initial appeal that's now been ruled against us, he should have carved out a FATCO hearing or at least a determination of restitution. This was objectively deficient performance. It is day-to-day practice in my experience in the Southern District and other districts that negotiations over loss amount in crafting a plea agreement and determining intended losses for a sentencing range is different than a restitution amount. And it's many, many times a defendant is permitted to leave restitution to be determined by the court. And that is hardly ever a deal breaker. So even if the plea agreement were to concede the intended losses, which is a different standard than actual losses, it was wholly deficient, objectively, by counsel to agree to not challenge these numbers. When the numbers basically, the numbers are this. The government has said that anyone who is recommended for disability, occupational disability, by Dr. Ajamian per se was committing fraud. And there's no . . . The district court went over the restitution part of the agreement of the appeals waiver, right? Yes. So how does the appeals waiver not apply then? Just by, you can say now that it was ineffective for him to agree to that when there's a specific amount of restitution? I mean, I could see it where you say, we agree to whatever restitution the government will, you know, provide later. But when the amount is there and he agreed to it, how do we credit that? The problem is the agreement was born out of incomplete knowledge of Dr. Ajamian's deficient performance of counsel. That number, $116.5 million, is not tethered to any actual loss whatsoever. None. Tethered to the applications that he participated in supporting. And to that extent, he knew that they were fraudulent. Now, the concern that I have is what basis do you think you have to think there would have been a plea agreement on any other terms? Because routinely restitution amounts are left open in plea agreements to be determined by the court or be as a hearing. And that hardly ever is a deal-breaker. And certainly there was no effort at all to do that, as shown by counsel's statement that he acknowledged that there were at least 78 people calculated who didn't even receive a disability recommendation from Dr. Ajamian. His reduction is to $53.4 million, I believe. And is there a basis to think that the plea agreement would have been anything less than that? Yes, because if the term of restitution, the actual loss amount calculation, would have been left to the court with a full hearing back at the time, the government would not have been able to show actual losses anywhere approaching $53.5 million. You had the opportunity to make that argument to the district court, didn't you? I mean, you had the opportunity when the court reduced it to $53 million to basically argue anything you wanted. And we believe that we made that argument? It's not the plea agreement anymore that's the problem. And you can hardly claim that the $53 million is the product of ineffective counsel because you got to argue anything you wanted on the $53 million, or am I missing something? I guess there's at least two issues. One is whether there's a procedural bar for Dr. Ajamian to challenge the restitution order, and that's how I'm addressing the ineffectiveness issue. The amount of restitution that currently exists of $53.5 million, we agree that the district court was correct and did not abuse its discretion as far as lowering it by at least throwing out the people who, you know, never applied. But we believe that the district court did not go far enough because the remaining $53.5 million, again, is not tethered to actual loss. And I see I'm out of time. Thank you. Good morning. May it please the court, John Klein for Dr. Lesniewski. I'm going to use my three issues, plus any questions the court might have. The first is the issue of the Certificate of Appealability for our appeal. We did not request one specifically on the restitution issue. In retrospect, I wish that I had, but the Judge Moreau did issue one on the sentencing issue, which was tied to actual loss, and this court has the power under 28 U.S.C. 2253 and Federal Rule of The notice of appeal itself constitutes under Rule 22 a request, and I'm asking this court to the extent it's necessary to issue a Certificate of Appealability. Are you going to address the cross-appeal of the government on the custody issue? I am. That's my next point. Kaminsky left open the question of whether a restitution order could be sufficiently onerous that it amounts to being in largely unexplored since then. Gonzalez mentioned the point. Boyd mentioned the point, but the question I think for this court to decide is how onerous is so onerous that you're in custody, and I submit to the court... We can't figure that out unless we know what the schedule of payment is, and there is no schedule of payment. There is no schedule of payments for Dr. Lesniewski. It's as determined by probation, and as far as I know, that determination has not been made. What I will say is this. When Dr. Lesniewski comes out of prison, he's going to be 70 years old, he's lost his medical license, and he's going to be facing a 70 million, or now 34 million dollar judgment. This is a man who has exhausted his resources defending this case, and who is going to be left essentially in poverty. If that... How is that different from a civil judgment for that amount? How is that different from a civil judgment for that amount? If it was civil judgment, which it can be at some point, how is that different? How is that a restriction on his freedom without a schedule of payments, or something else that, you know, impedes his ability to freely move about? That seems to be the standard. It's a restriction in the sense that the government, unlike a civil judgment where it's a private litigant who's trying to enforce it, here we have the government with its coercive powers that, coming after Dr. Lesniewski, presumably... They can't imprison him for non-payment, we know that. They cannot, that's true, but they can make his life so miserable, I would submit, as to be the functional equivalent of custody, because... That's not yet the case. I mean, you're speculating. The District Court and the Probation Department might very well impose a requirement that your and so if he's not earning anything, he'll pay very little, if anything. I mean, I expect the government doesn't really have much reason to think it's going to recover this judgment, but in any event, why is now the time to hear this unless and until he's confronted with onerous conditions on the payment? Well, I guess the problem, from our perspective, is it's a bit of a catch-22, because we have a finite period in which to bring a 2255 claim, and if we were to wait to submit that claim until Dr. Lesniewski was out of custody, out of custody in prison, and then subject to probation, and then he knew what the terms were, I think we might very well face the argument that we had missed a one-year statute of limitations. I'm not making myself clear. We would reject your argument now, but you would always be able to argue that if the district judge, on the day your client was released from jail, demanded payment of the entire amount, or find him in violation of his supervision, that that's an abuse of discretion. You'd have the argument there. We have no reason to think that's what the Number one, I think in this instance the sheer amount of the restitution order coupled with the other circumstances, Dr. Lesniewski's age, his lack of employment. So whenever it's a high amount of restitution because it's a big fraud, that's enough for a 2255 in custody violation. Is that right? At least under these circumstances, where if it were Bill Gates who was subjected to this judgment, I would say no. It's not going to be onerous for Bill Gates at all to pay this. He could write a check tomorrow. For a Dr. Lesniewski who does not have resources, who's 70 years old, who won't have a job when he gets out, I believe it is sufficiently onerous. Beyond that, Your Honor, I guess if what the court is saying, and I realize this is a unexplored area, but if what the court is saying is that the potential 2255 claim for a restitution order would accrue once the payment schedule is in place and we know how onerous it is, then I suppose we'll say fine and consider filing it then. What I'm saying is that we can't assume that this is the equivalent of incarceration unless and until we know the conditions. Right now, you can't make that claim, that it's the equivalent of incarceration, because there's no threat to him. There's no risk to him of such an onerous consequence. Well, I think the risk is he knows he's going to get out of prison in a few years and face a $70 million judgment. What I can't tell you and won't know until probation steps in is what is the schedule of payment is going to be. Thank you. Thank you. May it please the court, Daniel Trotting for the government. I represent the government at trial and the proceedings below and on appeal. The defendants restitution orders should not have been reduced for two primary reasons, one legal, one factual. Legally, there is no basis to reduce the defendant's restitution orders pursuant to Section 2255. As this court has held, Section 2255 is intended to address the custodial aspects of sentences and as this court held in Kaminsky, restitution is not custodial. Am I right in assuming that the likelihood of your collecting even the reduced amount is very remote? As a practical matter, Your Honor, I think that's right. If we were to reject the defendant's arguments on appeal, does the government want to pursue this question of when a fine is so onerous that it can be heard on 2255, or are you satisfied that if the main appeal fails that you don't need to pursue your cross appeal? Your Honor, I do think there is a reason to pursue the cross appeal, and I think there's a legal principle that is worth vindicating, which is that 2255 is not intended to address restitution orders, and understandably . . . Do you recognize that there is the possibility of a fine being so onerous as to be heard on 2255? Do you want us to draw the line in this case? Your Honor, I think a line can be drawn, which is that restitution amounts or fine amounts in and of themselves cannot constitute custody for some of the reasons that Judge Giordi was articulating, which is what is the amount? Is any high amount the amount that constitutes custody? This is a circuit where there are routinely restitution awards in the tens and hundreds of millions of dollars. If that amount, an absolute amount, were sufficient to trigger the limited exception of Kaminsky, it wouldn't be a rare exception, which is what Gonzalez described the Kaminsky exception as being. If a high restitution amount could satisfy the limited Kaminsky exception, the limited exception would effectively swallow the rule. To the point that was made about, well, it should be a relative analysis, so a $70 million restitution judgment would not be onerous to Bill Gates, but would be onerous to Dr. Luznowski. It cannot be the case that one's right to Section 2255 relief depends upon one's wealth. It certainly cannot be the case where in a situation where you have four defendants of different wealths, that the same restitution amount can be challenged under 2055 by certain defendants and not challenged by other defendants. It is not the amount of restitution that triggers the entitlement to challenge the restitution amount pursuant to Section 2255. The issue is whether there are terms that are onerous, and whether it's the payment terms, whether it's other terms. We suggested some that may or may not trigger the limited exception in our brief. Restrictions on one's ability to move, to leave the district, to leave the country, to work in a particular job. Those are restrictions on one's liberty, and those are restrictions that a court may say, okay, that is sufficiently severe and sufficiently similar to a custodial requirement that it can be challenged under 2255, but a mere dollar amount, a dollar amount that necessarily has to exist in every restitution order. If a defendant comes out of prison and the payment order is a million dollars a month, then theoretically under the Kaminsky approach, 2255 would lie at that point in order to say that the reduction to penury and what it would be is a form of custody. That's possible, Your Honor. We're certainly not there yet. And you're not conceding it either. We're not conceding, particularly because there are other avenues other than 2255 to address onerous payment terms. For example, the restitution statute itself provides provisions for a defendant at any time to come before a district court and say, my financial situation has changed for these defendants who have been in jail for a considerable period of time. I doubt they will have difficulty coming before a district court in satisfying that threshold requirement that my financial condition has changed. Therefore, I need payment terms that make sense for me right now with my financial condition. Am I correct that the determination of financial conditions and the payment terms would be made at a time when the financial needs could be taken into consideration? I'm sorry. I'm not sure I understand that. Am I correct that the payment terms would be fixed at a time when one could take into consideration what the defendant's circumstances are at that time? Yes, Your Honor. They could have been set at sentencing. They were not set at sentencing. Even if they were set at sentencing and seven, eight, nine years later, there's a . . . Circumstances change. There's a circumstances change. Those change conditions can be brought before the district court judge and the district court judge is empowered to Similarly, to the extent this is an issue on supervised release, under 3583 and Rule 32.1, the defendants can seek for the terms of supervised release to be modified such that the payment terms are consistent with their financial condition. Ultimately though, the defendants aren't seeking to challenge the payment terms. What the defendants are seeking to challenge is the payment terms. Again, that is not something that can be challenged under 2255. Did you raise this with the district court that it did not have jurisdiction to address restitution amounts under 2255? Yes, Your Honor. Was there any written opinion? I didn't see anything from Judge Marrero. The argument was not addressed. It was not addressed. The argument was raised. It was not . . . It was not resolved or addressed. Correct, Your Honor. If there are no further . . . Actually, I'm sorry, I would like to address one quick point on Dr. Jimmian's appeal. I just want to raise the point that this argument not only was rejected by the district court, the argument about ineffective assistance of counsel was raised in a prior 2255 proceeding. In this court, this court has held that Dr. Jimmian's plea was knowing involuntary, that his appellate waiver was knowingly involuntarily entered into. That is the law of the case, and Dr. Jimmian's appeal should separately be dismissed for that reason. Thank you. Judge, the reason the district court didn't discuss 2255 is because he decided on the Rule 33. When the judge denied the reduction for sentence on question of loss, and he ordered the parties to submit briefing on the loss because he wanted to know how to handle this post-trial finding that 498 pensioners were entitled to their pension. When you read the opinion, his opinion .